I probably got the pronunciation wrong. Good morning. Tanisha Massey-Mesley and Soloway, P.C., Pro Bono Council for Dao Chehazeh, and with me today are Pro Bono Co-Council Lindsey Granfield and Alita Lasker at the table from Cleary Gottlieb, Stephen Hamilton. Your Honors, I would request that I be allowed to reserve three minutes of my time for rebuttal. That will be granted. May it please the Court. We are here today because without this Court's intervention, Mr. Chehazeh will be forced to re-litigate removed proceedings in the face of no new evidence whatsoever, and years after the Board of Immigration Appeals reviewed this exact same record and upheld the immigration judge's asylum grant. Was there a real prejudice to just letting the process, I mean I know it's one of the arguments your co-council made, is there a real prejudice to just letting it run its course? You'll get a chance to litigate and you can always appeal to this Court at the very end. Your Honor, absolutely there is real prejudice here. And Mr. Chehazeh has already been through the removal process. He's already litigated fully his case. And he won. He won years ago. His case became final years ago. The BIA had the opportunity to review the exact same record that it has now reopened in the face of no new evidence whatsoever. And it absolutely would be a prejudice to Mr. Chehazeh to force him to re-litigate after his case has become final, especially when there is a presumption in the law and in the BIA's own regulations that there is finality in decisions. So one of the chief issues in this case regarding habeas is whether your client is in custody. I think we all understand that that doesn't necessarily mean you have to be incarcerated. So maybe you can move to that. Yes, Your Honor. The District Court erred in holding that Mr. Chehazeh did not meet the in-custody requirement because he was not in physical detention. And that's something that the government doesn't even contest. The standard here is whether or not Mr. Chehazeh is subject to restraints on his liberty, not suffered by the public generally. And the facts and circumstances of his case show that he is. Well, wouldn't the limit of your argument be, let me make sure I understand, Mr. Chehazeh, am I saying it right? Yes, Your Honor. Mr. Chehazeh, his only restraint, as you say, is that he's got to show up for court hearings, right? Respectfully, Your Honor, that is not the only restraint. Well, also that he has to let people know if he changes his address within five days? I mean, that doesn't really impede his movement, does it? Well, Your Honor, there is also the additional restraint on Mr. Chehazeh by virtue of the fact that he was previously detained by immigration authorities, that he is subject to being re-detained at any time, for any reason, by the Immigration and Customs Enforcement Agency. So anybody who's ever been detained previously is in custody? Your Honor, to the extent that they are in proceedings, and to the extent that they are still subject to, as Mr. Chehazeh is, to the regulation, to ICE's regulation stating that they can be re-detained at any time, and that would satisfy what the government has stated as an eminency requirement, that yes, that they would satisfy the in-custody requirement for purposes of habeas jurisdiction. And I think if you look at Mr. Chehazeh's case in total, this is a different situation, and these are restraints on him that are not shared by the public generally, because it is not every day that the BIA reopens, without any new evidence, a final order that it made years previously. Sure, but that's not the argument. The argument you're making goes way beyond his specific case, which I guess is why I'm a little surprised that you're pressing it this hard. I mean, it occurred to me that you've got the declaratory relief position you can take. Perhaps you could say, under the Administrative Procedures Act, you've got all by itself right there. You've got a federal question jurisdiction argument that you could be making. I'm wondering why you're leaning so hard on in-custody when the ramifications of what you're asking for go substantially beyond Mr. Chehazeh's case. And if we were to say the things you would like us to say, would in all likelihood be cited back to us by criminals saying, hey, I've got to show up for my preliminary hearing. I'm really in custody. I've got a habeas petition I want filed. I mean, aren't you pushing us out on a limb where you really don't need to push us? Your Honor, respectfully, I don't think that we're asking the court to go out on a limb. Specifically, we've cited cases from the district courts in California where the restraints were strikingly similar to those that Mr. Chehazeh is subject to at this time, specifically the Shake case and the Sandoval-Bella case. It would not be a stretch for this court to look at the facts of this case, especially considering the fact that habeas is not overly formalistic and that it is designed, when there are potential miscarriages of justice, to prevent those miscarriages of justice. It would not be asking this court to extend custody to everyone if we were simply to look at the facts of Mr. Chehazeh's case and see that it fits within case law with which the government doesn't even disagree. If we, for sake of argument, didn't see it the way you saw it, is the case over for you on this in-custody piece? Your Honor, our case is not wholly contingent on our petition for habeas corpus. We also have outstanding prayers for relief under declaratory judgment and a writ of mandamus, which the court below did not address. So why don't you, if you wouldn't mind, why don't you shift to the argument that even if there were a basis in habeas or in one of these others that could arguably exist, that 1252B9 and 1252G just knock you right out? You can't get ahead on that. Yes, Your Honor. I'll take 1252B9 first. 1252B9 does not preclude Mr. Chehazeh's case because it only applies where there is a final order of removal. And to hold otherwise in this case would mean that the BIA could reopen on a whim at any time without any individual ever having recourse. What happened to Mr. Chehazeh here is that, again, his case was final in 2004 after the BIA reviewed the exact same record, and now the BIA has reopened his case and what? Is your argument that under 1252B9 you may come to this court, as a jurisdictional matter, you may come to this court after a final order because there was a final order at one point and you're free to come here now? Is that it? Your Honor, looking at this case, the facts and circumstances of this case, we would submit that yes, essentially because Mr. Chehazeh has fully litigated his case, because he had a final order and the BIA reviewed this exact record, that this is the type of case that judicial review was meant for. But because without it and without federal court intervention, Mr. Chehazeh potentially is going to be forced to litigate his case over and over and over again unless he loses. And that can't be the result that Congress envisioned or that courts envisioned. So to put it simply, Your Honor, 1252B9 doesn't apply to Mr. Chehazeh's case. What about 1252G, where it says the Attorney General's decisions about adjudication? Or commencing proceedings, for that matter. I will address them both. Under 1252G, first of all, in Mr. Chehazeh's case, this is not a commencement of actions. The regulations, the BIA's regulations state that an action can only be commenced, removal proceedings can only be commenced through a notice to appear. And that is clearly not the case here. This is a reopening of prior proceedings, so it puts Mr. Chehazeh back in the place where he was previously. In addition, this is not an adjudication of Mr. Chehazeh's case. What we're trying to prevent here, the harm that we're trying to prevent, is the re-adjudication of Mr. Chehazeh's case. But isn't the purpose of 1252G regarding that commencing proceedings, isn't the purpose to preserve prosecutorial discretion about whether to pursue removal or not in a particular case? Yes, Your Honor. Why shouldn't that apply here? It doesn't apply here, Your Honor, because it would be a different circumstance if Mr. Chehazeh hadn't litigated his case or if he had lost. But Mr. Chehazeh fully litigated his case. He won a grant of asylum. The BIA reviewed the record, the exact same record that's before it now, and the BIA upheld the immigration judge's decision. And in point of fact, the immigration, INS at the time, abandoned its appeal. So what we have here... It can't be the commencement of an action because it's the same action, right? Correct, Your Honor. It is the same action. It's reopened. The proceedings have been reopened. But what about adjudication? I mean, there's that separate part of 1252G where the statute says, hey, if the Attorney General decides to adjudicate something, not to put too fine a point on it, courts, you guys butt out. Your Honor, this is not... The three areas that are covered by 1252G have been held by the Supreme Court to be very narrowly read. And Mr. Chehazeh's case simply does not fall within that purview. The BIA has regulations for a reason, and they have regulations specifically governing when a case can be reopened and when a case shall not be reopened. And that is what is at issue here. ICE brought a motion to reopen, and ICE was subject to the BIA's regulations that said a motion to reopen shall not be granted unless there is new material evidence that was not and could not have been discovered previously. And ICE failed to meet that standard, and so it was incumbent upon the BIA to deny that motion. Instead, what the BIA did was the BIA improperly invoked its who-responded authority to reopen Mr. Chehazeh's case when the BIA had already reviewed the exact same record. Sure. We know what the facts are, but you said the Supreme Court has defined that very narrowly. Why don't you tell me about that? Tell us about that. What is it that the Supreme Court said that would cause us to read that in a limited way? Well, I think, Your Honor, I think with respect to adjudication of cases, according to the Supreme Court, the 1252G was created to prevent, for example, interlocutory appeals that might arise to contest the way that proceedings were being conducted. That is not the case here. Mr. Chehazeh's case has already been litigated. It has already been adjudicated, and what we have come before this Court for and have sought relief for is to prevent the re-adjudication of his case when his case was already final. And I think that is one of the key things that we have to keep in mind. This case was final. The BIA reviewed Mr. Chehazeh's case and actually had de novo review authority to review his case. The BIA had from 2002 until 2004. It looked at his case on the exact same record. The government doesn't contest that there are no new facts alleged, and the BIA looked at this case and it said, Mr. Chehazeh's asylum grant should be upheld. And the BIA should be held to its own regulations. ICE was required to follow the requirements for reopening under the BIA's regulations, and the BIA should not be able to circumvent those regulations and abuse its discretion by invoking a sua sponte authority. I have one more question if my colleagues will indulge me. Yes. You make much of the BIA having a standard for reopening sua sponte, and that it has to be exceptional circumstances. And my question to you is, since one of the things the BIA said was, it appears to us that the immigration judge was not impartial, would that not be an exceptional circumstance to have a decision maker who was apparently not impartial making a decision? If the BIA had a basis for saying that, would that not fit the BIA's own standard of exceptional circumstances? Respectfully, Your Honor, there is no way in this case, looking at the circumstances of this case, that the BIA's explanation that there was somehow bias on the part of the immigration judge could possibly, in this case, could possibly constitute an exceptional situation because that actually was a basis for the appeal. Hold up. You're answering a different question. My question to you is not whether they're right that she was biased, but whether, as a legal matter, it would constitute an exceptional circumstance if there were a biased decision maker below. Your Honor, I can't speak to every situation, and I think it would depend on the facts and circumstances of that case and what the BIA has said about whether or not that constitutes an exceptional situation, but what I will come back to is that... This judge wasn't. Excuse me? I mean, I understand. Your position is this judge wasn't. That's clear. You're right. And it was also raised below, and the BIA had that and reviewed that in 2002, between 2002 and 2004. Gotcha. Thank you. Good afternoon. May I please have the court? Erez Ruvani on behalf of the acquittal. How do you say your name again, sir? Erez. That's E-R-E-Z. Right. Ruvani. R-E-U-V-I. Ruvani? Okay. Ruvani, yes.  about the enforcement of the Immigration and Nationality Act. There are a number of questions, jurisdictional hurdles, each of which alone, if the appellant fails to satisfy, kicks this case out of federal court on a jurisdictional basis. I'd like to begin, although the court below focused on habeas, with Section 1252b-9 and Section 1252g. It's important to understand that those amendments to the INA in 2005 I believe affected a sea change in the application of habeas corpus relief in removal proceedings. Prior to 2005, the habeas proceedings occurred in tandem with appeal to the Federal Courts of Appeals and such piecemeal litigation occurred in removal proceedings. In this court, in Bonamentra 2005, discussed the whole point of the amendments was to end the piecemeal litigation, that there would be one bite of a streamlined apple, so to speak, in the Court of Appeals after a final order of removal. The appellants looked to Section 1252b-9 and 1252g suggesting that there must be a final order of removal before those provisions kick in. Well, that's what the Supreme Court said in St. Cyr, isn't it? Respectfully, St. Cyr is a pretty real ID case applied to a regime that still allowed habeas review of removal proceedings piecemeal prior to a final order of removal. Well, nothing in the 2005 amendments changed the point about 1252b-9. I mean, 1252b-9 and 1252g weren't amended in 2005, were they? Respectfully, they were. They were specifically amended to strip the courts of habeas. I apologize. There was the addition of the habeas paragraph in 1252b-9. That's right. But 1252g was not, nor was the other language in 1252b-9, right? I believe. I'm unsure about 1252g, but our argument wouldn't depend on that. 1252g combined with 1252b-9. So assume there's no, we agreed with you about they're not in custody. We're talking about some other jurisdictional basis, either the APA or the Declaratory Judgment Act. So we're not talking about habeas relief. We're talking about general jurisdictional issues here. What is it about the 2005 amendments that changes this statement in St. Cyr? Quote, its purpose, that is, 1252b-9, is to consolidate judicial review of the immigration proceedings into one action in the Court of Appeals, but it applies only with respect to review of an order of removal. What's different is that in 2001, is that when St. Cyr was making that statement? Yeah. Individuals could still go to the district court challenging removal proceedings during those removal proceedings or even at the end of removal proceedings before going to the Courts of Appeals. I'm not following your logic because this Court is not speaking to whether or not they can go to the Court of Appeals directly or not in the context of this statement. This statement is reflecting what the Supreme Court says 1252b-9 means when it says you have to interpret it in light of 1252b. If you've got to interpret it in light of 1252b, that's as true today as it is in 2001, isn't it? Respectfully, no. In 2005, what the Real ID Act did, and this is in the legislative history, it's discussed in the Aguilar case, which is the most thorough treatment of the issue that we refer to in our briefs that's out of the First Circuit. What the Real ID Act sought to do is to preserve habeas solely for one type of cause of action, where the individual is contesting the conditions of their physical custody. That's in the legislative history. That's in the Aguilar case. But following, after 2005, what needs to occur, what Congress envisioned, is the aliens challenging the removal proceedings. When it goes through the removal process, the Aguilar Court referred to this as administrative exhaustion. This Court has referred to it as jurisdictional exhaustion in a pre-Real ID case default. But either way, what the Real ID Act did is not strip the courts of jurisdiction. It just told the courts when they may consider certain types of claims. What it sought to do was end claim splitting between peace and litigation at the habeas level of the district court and on appeal after a final order of removal. What it does is channel all claims to the courts of appeals after and only after a final order of removal. Until that final order of removal occurs, they haven't exhausted their relief. How can it be the case that... Or maybe it's better for me to ask it this way. Are you not making an argument then that this is the type of thing which is beyond judicial review? It's capable of repetition yet evading review, right? I don't believe so, Your Honor. This is reviewable, without a doubt, but not at this stage in litigation. That misses what their argument is. Their argument is not that, hey, I'm not subject to a removal proceeding. It's, hey, I had a removal proceeding. And there's no reason, and I have a final order. And it's a final order in my favor. And therefore, to put me back in the cycle for no reason except they can is to effectively say they can keep doing this to me forever until they find an I.J. they like. And that that can't possibly be what the Congress had in mind. Now, you say, and I think there's more than a little irony in this, appellant is scheduled to appear before an immigration judge for his removal proceeding April 27, 2011. At that time, you may address the issues, etc. And, quote, that will end the matter. By your logic, it won't end the matter by any stretch. Because if the I.J. says the same thing that was said last time, you can go back and do it again, right? And if the I.J. after that says it, you can go back and do it again, right? Respectfully, absent some showing on the record that there's irregularity on the administrative level, we take the board and the I.J. at their word and assume that they're acting in good faith. They'll be able to go before the I.J. Answer my question when you say, I didn't suggest that they weren't acting in good faith. I'm just saying, by your logic, and as your opponents argue, there's no end to that cycle, is there? Logically, there's no end to that. No matter how good faith they're acting in, if they want to keep doing it, they can keep doing it, right? There can never be finality. This is theoretical more than practical in the sense that what will occur here is the new issue that was raised by the B.I.A., whether there was unfairness in the proceedings and whether, pursuant to the affidavit that was submitted before the board with ICE's motion, which was later relied on in response to the reopening, that this particular individual, they could not determine whether this person was a national security threat at that time. These are the things that will be reviewed and litigated before the I.J. then goes up to the board and then will come here on appeal. So you're saying, if I'm hearing you right, you're saying that, logically, there's not an end to this process. But don't worry, because we wouldn't do that. No, I don't think so. I can see the argument being made, but if there was nothing new at all in the record, which we dispute can be reviewed on a sua sponsa type case under the circuit's precedent, but if there was nothing new, that may be a concern. There is, in fact, new material here, which, although may not be... Is it under seal or something? It's what was in the affidavit that was submitted in 2007 by an FBI agent in which they stated, despite the five years of review, they cannot at this time determine whether this individual is, in fact, a national security threat or not, such that he could not pursue adjustment at this stage, he could not naturalize, and so on. That was all information, according to your opponent on the other side there, that they had before. And I read Agent Alicia... I think it's Alicia? Agent Alicia's affidavit? Yes, I believe that's correct. And I was having a hard time seeing something that wasn't said before. Is there something new in his affidavit that wasn't said before, or is it just a different conclusion? I believe what they considered new is this conclusion that they, at this time, cannot determine this individual is not a national security concern. How can one ever disprove a negative? I mean, if the FBI comes back and says the information is the same, but we can't say there's not a security threat, is there any response that a person can make to that? In the removal proceedings, should they occur, the government will be held to its burden to meet that assertion. They won't just rely on the simple, I said so, therefore we win. They're going to require the foreign neutral arbiter to present evidence that neutral arbiter will reach factual conclusions, the board will review those factual conclusions, and then we'll be back in federal appellate court if necessary. But the entire, short-circuiting that entire process, and this is the whole point of the 1252B9 and 1252G amendments to the INA and the Real ID Act, there is a time and a place under those amendments for these claims. That time and place is before the IJ, then before the board, then before this Court on appeal. And if I may move for a moment to the sua sponte question. The appellants appear to ascribe some sort of questionable motive to the BIA, that they may reopen and reopen and reopen and act in this infinite loop that you just alluded to, Your Honor. We presume that the agency acted at their word, there's a presumption of regularity. What they've done here under this circuit, and there's many cases in this circuit on the subject, absent two limited exceptions that don't obtain here, that issue is not reviewable in federal court. Well, you ought to respond to your opponent's argument in briefing that every case you've cited is a case in which our court or another court has said we can't review a decision not to reopen sua sponte, and that that's functionally different from a decision to open sua sponte, specifically citing Heckler v. Cheney and the discussion in there about the difference between a court acting and a court not acting. So why don't you address that point? They say you have no case on point because they're all on the negative side, none of them in a circumstance where the BIA acted. What's your argument in response? I would respond to that in two ways. First, in subsequent 28-J briefing and letter form, we submitted a case, Suarez 2008, unpublished decision, that addressed the affirmative granting of reopening as opposed to the denial of sua sponte reopening. Second, the parties addressed this in a second 28-J letter, the Plumy case, a recent case out of the Third Circuit. Brilliantly written, right? It's a Judge Jordan opinion. Well, we like the case. Our panel likes the case as well. The case there discussed the general proposition that reopening, whether it's granted or denied, is not subject to judicial review. What occurred in the Plumy case, the court addressed a limited exception. Was there legal error? Did the board misunderstand the legal scope of its discretionary authority? If that is the case, the court has limited jurisdiction to address the scope of the correct legal authority and remand for the board to exercise that authority. But, and if I may quote from there, or I guess I'm paraphrasing here, on remand, the BIA would be free to deny or grant reopening sua sponte, and we would have no jurisdiction to review that. Well, let me ask this. Is there not a difference? When you say there's no jurisdiction to review a denial, that's always in the context of, has been said in the context of, we don't have any standard to measure that against. Here there is a standard, as your opponent is saying, and it's the exceptional circumstances standard. Doesn't that make a reasoned difference, a reasoned distinction? I think the court's decision in Plumy speaks to that as well. There is this language, exceptional situation, that appears in board decisions discussing the standard for reopening. It doesn't appear in the regulation. It's a construct that the board is applying its authority. But it's got the force and effect of law in the sense of it is a standard by which the board acts, right? Well, that's right. And if I may refer to Plumy again, there the court identified only one situation in which exceptional circumstances had been articulated in a consistent case-by-case manner in which the court could reasonably find that the BIA had cabined its discretion under that standard and provided a meaningful standard for the court to apply. That's in the board's decision of In re Pickering, which addresses an aggravated felon's removal when his underlying conviction has been overturned in the duration of his removal proceedings. There is a standard to apply because the board has provided one case after case. This falls from the general principle in administrative law where if the agency cabins its discretion that's otherwise discretionary, then a deviation from that is reviewable. You may remand to the board to explain the discrepancy from previous practice. What's the backstop? Is there any backstop at all, Mr. Ruveni, to the infinite loop? Is there a due process argument that can be made? And if so, at what juncture would a person make it? I guess I'm going back to a question I've asked before, but I don't feel like I've understood your answer. Is there no point at which an immigrant could say, hey, they're just not treating me fairly. Make them stop. We would believe that point, again, is in the removal proceedings where there will be an evidentiary hearing where the government will be put to its burden and be forced to represent what it claims are these national security interests. That can be done in camera. That can be done in testimony. Yeah, but isn't that going to break? I mean, the petitioner here already is, I mean, he's had some problems with debts and all. I mean, eventually you'll run out of money. You won't be able to defend yourself, right? You keep having to go through this exercise. So there's got to be a final point, right? Well, every point of finality must be reached. I don't believe it appears here in this case. You have to figure that out, though, right? I mean, you seem to be making the argument that, yeah, there's no end in sight, but don't worry about that. And I guess I'm trying to figure out if I'm understanding that argument right. If that really is your pitch, if your argument is, it's true, this could go on forever, but don't worry, we wouldn't let that happen. Respectfully, that's your paraphrasing of our argument. I wouldn't say it. What is the end point, then? I've heard you say we have to presume they'll act in good faith, but that's the only thing I've heard you say in this regard, and that sounds to me like trust us, and that's what I'm trying to belly up to, is if it's true that your position is, yes, as a logical matter, this could go on forever until the BIA gets it to an IJ who will rule against them. As a logical matter, that's true, but don't worry about it. Then that's all I want to hear you say. If that's your position, that's your position. But if you've got a reasoned argument for why that isn't a risk, I really want to hear it. Generally, when an accusation is made that they're acting in bad faith, that they're doing something for ulterior purposes, that they're not doing what they're supposed to be doing in a fair and consistent manner, we can find that in the record. We point to it. We look for it. Until that point has been reached, the concern about an infinite loop is just a theoretical concern. Once that point is reached, it comes back to the court of appeals and says, look, we presented our case. We have the evidence here. This is an incorrect legal premise. Then that's your backstop, but we haven't reached that point yet. That's our backstop. How would they raise that? I guess that's what we're going back over, and I don't mean to try my colleague's patience or yours, but how did they raise it? Because your argument is you don't have jurisdiction to look at that ever. At this point. Well, at what point? Once they go to the IJ. Assume this went four or five iterations down the road. What would prevent your colleague from main justice coming up here three years from now, four or five iterations down the road and saying, well, you still don't have jurisdiction to look at for the same reason we told you back in 2011? Let me compare it by analogy, if I may say, I'm over my time here, to say other non-final orders that occur in the removal process, a decision to reopen, a decision to appoint counsel, decisions that are not immediately reviewable and are only reviewable once the administrative process articulated by 1252B9, 1252G, and the court's general exhaustion doctrine is exhausted. Once that's all taken care of here, the court will be able to, on a new, fresh record, where this new evidence is tested, reach that decision. If there are no more questions. Thank you. Thank you. Thank you. Could you tell us, as a practical matter, why your adversary's response to Judge Jordan's question is wanting? Yes, Your Honor. The reason that we're here is because Mr. Chiazza has already been through the process that the government speaks of. The government would now have Mr. Chiazza go through his removal proceedings again, and the only justification for that is, well, the government can meet its burden this next time. But what we need to do here is we need to look at the circumstances of this case and what happens, as the court is rightly concerned about, if there can never be an end to removal proceedings in the event that someone wins and prevails, and in the event that, to the extent that there is a motion to reopen that is brought by the government, that the government is not held to the same standards as an alien would be held to if they brought a motion before the court for reopening. That is what this case is about. Mr. Chiazza has been through removal proceedings. He was granted asylum in 2002. The government appealed. The government, I would also highlight, Your Honor, is that at the time, one of the bases for Mr. Chiazza's grant of asylum was actually the security grounds, the 9-11 security grounds, that the government now says is a reason that they can't rule out Mr. Chiazza as a national security risk. Mr. Chiazza voluntarily came forward to offer information about the 9-11 hijackers. And then he was detained, right? And he was detained as a material witness and then released. And in the IJ's decision, the immigration judge said, the FBI has found that you are not a danger, you are not a national security risk, and we thank you for coming forward. So that was fully litigated. Those facts were known. And as the court rightly points out, there is nothing in Agent Alastair's affidavit that shows that these facts were not known and could not have been discovered previously. There is nothing new or material here, either with respect to alleged national security threats posed by Mr. Chiazza or in terms of misrepresentation, which was the other basis of the government's motion to reopen. The bottom line here is that all of this was laid bare, not only before the immigration judge, but by the Board of Immigration Appeals. The Board of Immigration Appeals had de novo review power over Mr. Chiazza's case, and it chose on the record, the exact same record, to uphold the immigration asylum grant. ICE did not meet its burden, and to the extent that this case is allowed to go forward and Mr. Chiazza is forced to relitigate his claims once again, that will send the message that no matter if you prevail, no matter how long it's been, if the BIA, if ICE can't meet its burden, the BIA can step in, the BIA can invoke its sua sponte authority, thereby insulating its decision from review, and you will have no recourse, you will have no choice but to be that hamster on the wheel again and again and again, perhaps. So what we ask this court is that Mr. Chiazza has shown, whether it be through habeas corpus, whether it be through declaratory judgment or writ amendemus, Mr. Chiazza has shown that his case is properly before the federal courts for review, and we respectfully request that this court reverse the district court's ruling and remand for a decision on the merits. Thank you. Thank you, counsel. We thank counsel for their excellent briefing and argument, and we'd like to especially recognize counsel for appellants who took this case pro bono. They did an excellent job, and the court is especially appreciative of folks who come forward to render pro bono service. So thank you so much for doing that. The clerk will adjourn court.